UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

RX SAVINGS, LLC, et al.,           )
                                   )
                                   )
            Plaintiffs,            )
                                   )
v.                                 )        Case No. 19-2439-DDC
                                   )
DOUGLAS BESCH, et al.,             )
                                   )
                                   )
            Defendants.            )

## ORDER

    This started as a fairly straightforward unfair-competition suit when Rx Savings, LLC asserted breach-of-contract claims in state court seeking damages and injunctive relief against a former employee, Douglas Besch, and Besch Holdings, LLC, the company through which he owned an interest in Rx Savings. Since then, the case has expanded considerably, with myriad claims for tortious interference, unjust enrichment, breach of fiduciary duty, conversion, violations of the Computer Fraud and Abuse Act (18 U.S.C. § 1030), civil conspiracy, misappropriation of trade secrets, and counterclaims for securities fraud, common-law fraud, and unjust enrichment.

    The core of this case involves a dispute between Rx Savings and Besch after he left the company and began to work for DR/Decision Resources, LLC, d/b/a DRG Adaptive ("DRG"). Relevant to the four non-dispositive motions currently pending before the undersigned U.S. Magistrate Judge, James P. O'Hara, is the "non-compete" provision of certain Unit Purchase Agreements ("UPAs") that Besch entered into in 2017. Besch

negotiated with Dan Henry, a shareholder and board manager for Rx Savings, to sell Besch's remaining ownership interests to Henry and four other investors in Rx Savings. Although Henry retained his own legal counsel to assist, he also communicated with Brandy Rea, Rx Savings' in-house counsel, about the UPA transactions. It's the latter communications which are primary focus of the pending discovery disputes.

The parties have conducted significant discovery since the original scheduling order was entered on September 26, 2019, but with many and frequent disputes. Most recently, on July 23, 2020, defendants filed a motion to compel the production of certain e-mails (ECF No. 128), and on July 31, 2020, plaintiffs filed a motion for protective order regarding these documents (ECF No. 136). Specifically, defendants seek to compel eight e-mails between and among Henry, Michael Rea (another executive and board manager at Rx Savings), and Brandy Rea (as mentioned earlier, the company's general counsel). Plaintiffs contend that these documents are covered by attorney-client privilege and work-product protection.

Defendants' motion to compel also seeks other e-mails listed in plaintiffs' privilege log that they contend are not privileged. Further, their motion asks the court to order plaintiffs to produce any additional documents or communications "to or from Ms. Rea, or reflecting advise from Ms. Rea, related to the subject of the drafting or negotiation of Besch's UPAs and non-compete provision."

Defendants also have filed a motion to appoint a special master to quickly and efficiently handle discovery disputes that are anticipated to crop up in the future (ECF No.

132).  Despite the parties' frequent discovery fights, plaintiffs oppose that motion.

Defendants note plaintiffs never filed a formal opposition to the motion to compel; rather, plaintiffs filed a motion for protective order regarding the subject e-mails. Defendants argue this is procedurally improper.  As discussed below, the court agrees with defendants in this regard, i.e., attorney-client privilege isn't a proper ground for a protective order, and the court will rule on that motion accordingly.  But in the interest of forward progress, the court will address the privilege arguments of these e-mails on the merits.

Efforts to Confer

As a threshold matter, the court first considers whether the parties have sufficiently conferred about the motions, as required by D. Kan. R. 37.2.  The parties have conferred over these issues via phone and e-mail multiple times.  Additionally, the issue of the privileged e-mails was raised to the court and discussed during a discovery conference with the court on July 15, 2020.  As such, the court is satisfied counsel have adequately conferred for the purposes of the motions.

E-Mail Category 1

As earlier indicated, the eight e-mails at issue were exchanged between and among Henry, Mr. Rea, and Ms. Rea.  Plaintiffs assert these contain legal advice by Ms. Rea as Rx Savings' in-house counsel regarding the UPAs that Besch entered into upon leaving Rx Savings, and specifically the non-compete clause included in the UPAs.  The record is uncontroverted that the company was required to approve the sale because "Besch knew and had helped to develop Rx Savings' confidential and proprietary business information

and trade secrets."[1]  Plaintiffs previously offered to produce these e-mails if defendants would stipulate that any privilege waiver would apply only to those specific e-mails. Defendants proposed their own stipulation.  Ultimately, though, the parties couldn't agree on the language of <u>any</u> kind of stipulation, which the court believes is perfectly understandable given the situation.

<u>Attorney-Client Privilege</u>

Defendants argue the e-mails aren't protected by attorney-client privilege because in these conversations Henry was acting as a private individual represented by private counsel, and not in his capacity as a board manager of Rx Savings.  Simply put, defendants contend Henry was a third-party for the purposes of waiving attorney-client privilege.[2]  For the reasons explained below, the court respectfully disagrees.

The Tenth Circuit defines attorney-client privilege as follows:

> The attorney-client privilege protects confidential communications by a client to an attorney made in order to obtain legal assistance from the attorney in his capacity as a legal advisor.  The mere fact that an attorney was involved in a communication does not automatically render the communication subject to the attorney-client privilege; rather, the communication between a lawyer and client must relate to legal advice or strategy sought by the client.[3]

---

[1] ECF No. 137 at 4.

[2] *Id.* at 8.

[3] *Ad Astra Recovery Servs., Inc. v. Heath*, No. 18-1145-JWB, 2019 WL 1753958, at *2 (D. Kan. Apr. 19, 2019) (citing *In re Grand Jury Proceedings*, 616 F.3d 1172, 1182 (10th Cir. 2010)).  Kansas state law defines attorney-client privilege nearly identically. "[C]ommunications found by the judge to have been between an attorney and such attorney's client in the course of that relationship and in professional confidence, are privileged, and a client has a privilege: (1) If such client is the witness, to refuse to disclose

The privilege of course doesn't apply "to every interaction between attorney and client."[4] There must be a connection between "the subject of the communication and the rendering of legal advice" for the attorney-client privilege to shield the communication from disclosure.[5] Legal advice must predominate for the communication to be protected, i.e., the privilege does not apply where the legal advice is merely incidental to business advice.[6] The privilege only protects the disclosure of communications, not disclosure of the underlying facts by those who communicated with the attorney.[7]

Defendants don't dispute Henry was a board manager of Rx Savings at the time in question. Nor do they seem to dispute that e-mails involving Henry in that sole capacity could be covered by attorney-client privilege. That is, a party may demonstrate the privilege applies to communications among corporate management employees by "establishing that the communication was made in confidence for the primary purpose of

---

any such communication; (2) to prevent such client's attorney from disclosing it; and (3) to prevent any other witness from disclosing such communication if it came to the knowledge of such witness (i) in the course of its transmittal between the client and the attorney, (ii) in a manner not reasonably to be anticipated by the client or (iii) as a result of a breach of the attorney-client relationship." Kan. Stat. Ann. § 60-426(c)(3).

[4] *Cypress Media, Inc. v. City of Overland Park*, 997 P.2d 681, 690 (Kan. 2000).

[5] *White v. Graceland Coll. Ctr. for Prof'l Dev. & Lifelong Learning, Inc.*, 586 F. Supp. 2d 1250, 1269 (D. Kan. 2008).

[6] *Id.*

[7] *Ewald v. Royal Norwegian Embassy*, No. 11-CV-2116 SRN/SER, 2014 WL 1309095, at *6 (D. Minn. Apr. 1, 2014).

obtaining legal advice."[8]   Attorney-client privilege applies to legal advice given to board members by counsel.[9]

But defendants argue that since Henry was represented by private counsel for the purposes of negotiating the UPAs with Besch, he was acting in a private capacity, and therefore "must be considered a third party to privileged communications between Rx Savings' in-house counsel and members of its executive team with respect to the subject matter of the e-mails."[10]   Defendants claim plaintiffs now want to have it "both ways" in their characterization of Henry's role.[11]

Parties, though, may have different roles with regard to protected communications.[12] It is true that communications with corporate legal counsel must be within the scope of the employee's duties in order to retain the privilege.[13]   Here, notwithstanding Henry's own transaction with Besch, the court finds the communications are privileged.   Brandy Rea, the company's chief legal counsel, was approached by Henry regarding the UPAs for the

---

[8] *White*, 586 F. Supp. 2d at 1269.

[9] *Hinsdale v. City of Liberal, Kan.*, 961 F. Supp. 1490, 1494 (D. Kan.), *aff'd*, 981 F. Supp. 1378 (D. Kan. 1997).

[10] ECF No. 129 at 8.

[11] ECF No. 142 at 10.

[12] *Great Plains Mut. Ins. Co. v. Mut. Reinsurance Bureau*, 150 F.R.D. 193, 197 (D. Kan. 1993).

[13] *Shriver v. Baskin-Robbins Ice Cream Co., Inc.*, 145 F.R.D. 112, 114 (D. Co. 1992).

proposed shareholder transaction.[14]   Henry was, at the time, a board manager for the company, along with Mr. Rea, roles they both continue to hold.[15]   Ms. Rea was involved in drafting the UPAs and communicated with Mr. Rea and Henry regarding their terms.[16] The record indicates the e-mails here involve the company's legal counsel "providing advice and assistance to ensure that the form Unit Purchase Agreement was acceptable to and would protect Rx Savings, which was required to approve the contract and would be a third-party beneficiary of the restrictive covenants."[17]

Defendants implicitly argue that the mere fact that Henry had separate counsel to advise him personally in connection with acquiring some of Besch's ownership interest in Rx Savings means Henry couldn't legitimately seek legal advice from Rx Savings' in-house counsel about how the transaction should be structured.  If Henry were a stranger to Rx Savings' management, this argument might be persuasive.  But those aren't the facts here.  In addition to Rx Savings having to approve the transfer, Henry was about to invest a considerable amount of additional capital into Rx Savings, and he was going to continue serving as a board manager of Rx Savings.  So it hardly seems much of a surprise that he'd seek input from Ms. Rea as in-house counsel about how best to protect the company's long-term interests, in addition to seeking advice from his own lawyer about best to protect his

---

[14] ECF No. 137-1 at 1.

[15] *Id.* at 1.

[16] ECF No. 137 at 4.

[17] *Id.* at 7-8.

personal long-term interests.

The substance of the e-mails, which plaintiffs submitted to the court for *in camera* review, confirm this.    The e-mails labeled CTRL00004898, CTRL00005212, CTRL00005213, CTRL00023911, and CTRL00023912 involve communications about the non-compete terms in the UPAs.  The e-mails labeled CTRL00004739, CTRL00004741, and CTRL00004854 involve the form of the UPAs, as the company was required to approve the sale of Besch's ownership interest;[18] the substance of the e-mails supports plaintiffs' position they were discussed with Henry in his capacity as a board manager.  Ms. Rea, in her declaration, confirms these communications involve whether "the Unit Purchase Agreement was acceptable to the company and related legal matters concerning the transaction."[19]

The court agrees with plaintiffs that because Henry was a board manager, the privilege applied to him because "separate and apart from his role as a party to the transaction action, [he] shared responsibility for making decisions for Rx Savings."[20]  Ms. Rea's legal advice was provided in her capacity as general counsel, a role that "concerned what was in the company's best interests"[21] – not the interest of any one individual.  In his capacity as a board manager, Henry received legal advice regarding the UPAs and "what

---

[18] ECF No. 137-1 at 1.

[19] *Id.* at 3.

[20] ECF No. 137 at 8.

[21] ECF No. 137-1 at 2.

was best for the company concerning the proposed shareholder transaction with Mr. Besch."[22]  The purpose of the communications was to render legal advice.  The parties involved in the communication appeared to understand the purpose of the e-mails was to review and consider the legal issues from the company's perspective in handling the UPA with Besch.  Therefore, the court finds the communications at issue are covered by attorney-client privilege.  This holds true, notwithstanding the parties' reported negotiations of a stipulation.  The offer to stipulate a limited waiver of the privilege of these communications did not ultimately lead to an agreement; the initial offer in no way renders the communications unprivileged.

Work Product

Defendants argue these e-mails were not sent in the anticipation of litigation because they were sent before any UPAs were executed and before Besch began his employment with DRG.  Further, defendants correctly note plaintiffs abandoned the work-product argument in their briefing.  For these reasons, and because the court has already deemed the documents to be protected by attorney-client privilege, the court will not go into additional analysis on the work-product theory.

E-mail Category 2 & Additional Documents

Defendants extend their waiver argument to apply beyond those eight e-mails and to additional e-mails on plaintiffs' privilege log, specifically five e-mails related to drafting

---

[22] ECF No. 137 at 8; ECF No. 137-2 at 2.

or negotiation of the UPAs and non-compete provision, labeled CTRL00003987, CTRL00004665, CTRL00005105, CTRL0005792, and CTRL00006065.[23]    The descriptions on the privilege log describe these e-mails as involving the same topics:  "e-mail from in-house counsel forwarding unit purchase agreements for Besch holdings to CEO;"[24] "redacted string e-mail between in-house counsel and CFO regarding legal advice pertaining to Besch transaction;"[25] "forwarded e-mail between Dan Henry and CEO including e-mails from outside attorneys regarding closing documents and attaching unit purchase agreements;"[26] "e-mail communication between in-house counsel, CEO, and CFO discussing unit purchase agreement;"[27] and "string e-mail with in-house counsel, CEO, and CFO regarding cap table and legal advice for agreement with Besch."[28]  For the same reasons as discussed above, the court declines to find the privilege has been waived on the present record.  At defendants' request, though, their motion to compel is granted to the limited extent that plaintiffs shall produce the five e-mails for *in camera* review.  The court will then enter a short supplemental order regarding the applicability of the attorney-client privilege.

---

[23] ECF No. 129 at 8.

[24] CTRL00003987; ECF No. 129-1 at 7.

[25] CTRL00004665; ECF No. 129-1 at 7.

[26] CTRL00005105; ECF No. 129-1 at 7.

[27] CTRL0005792; ECF No. 129-1 at 7.

[28] CTRL00006065; ECF No. 129-1 at 7.

Protective Order

As earlier indicated, rather than file an opposition to defendants' motion to compel, plaintiffs filed a motion for protective order.  Under Rule 26(c) of the Federal Rules of Civil Procedure, upon a showing of good cause, a court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Discovery may be proscribed or limited to prevent abuse.[29]  The court has broad discretion to decide when a protective order is appropriate and what degree of protection is required.[30] The party seeking a protective order has the burden to demonstrate good cause.[31]

However, privilege isn't a valid basis for a protective order under Rule 26(c). Plaintiffs may raise privilege objections as to certain discovery requests or in response to a subpoena.  The court notes, though, "it is well-established in this District that blanket claims of attorney-client privilege or work-product protection do not satisfy the objecting party's burden of proof."[32]  Rule 26(c) does not provide for any type of order to protect a

---

[29] *In re Urethane Antitrust Litig.*, No. 04-MD-1616-JWL, 2010 WL 4226214, at *2 (D. Kan. Oct. 21, 2010).

[30] *See Rohrbough v. Harris*, 549 F.3d 1313, 1321 (10th Cir. 2008) ("The modification of a protective order, like its original entry, is left to the sound discretion of the district court."); *see also Univ. of Kan. Ctr. For Research, Inc. v. United States*, No. 08-2565, 2010 WL 571824, at *3 (D. Kan. Feb. 12, 2010) (citing *MGP Ingredients, Inc. v. Mars, Inc.*, 245 F.R.D. 497, 500 (D. Kan. 2007)) (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984)).

[31] *Aikens v. Deluxe Fin. Servs., Inc.*, 217 F.R.D. 533, 534 (D. Kan. 2003) (citing *Reed v. Bennett*, 193 F.R.D. 689, 691 (D. Kan. 2000)).

[32] *Kemp v. Hudgins*, No. 12-2739-JAR-KGG, 2013 WL 4857771, at *2 (D. Kan. Sept. 10, 2013) (citing *Linnebur v. United Telephone Ass'n*, No. 10–1379–RDR, 2012 WL

party from having to divulge privileged information or materials that are not calculated to lead to the discovery of admissible evidence.[33]

The court agrees with defendants that plaintiffs should have appropriately asserted their objections to the e-mails at issue through an opposition to the motion to compel. Plaintiffs' failure to do so muddied the record and generated unnecessary briefing. Anyway, since case law is clear that protective orders will not be granted based on privilege arguments, the motion for protective order is denied.

Special Master

Defendants have moved for the court to appoint a special master to handle future discovery disputes.  Plaintiffs oppose this request, arguing it's unnecessary and thus inappropriate at this stage.

The appointment of a special master is reserved for exceptional circumstances.[34] The decision to appoint a special master is in within the trial court's sole discretion.[35]  The special master is intended to "aid judges in the performance of specific judicial duties, as

---

1183073,*4 (D. Kan. April 9, 2012)).

[33] *Aikens v. Deluxe Fin. Servs., Inc.*, 217 F.R.D. 533, 534–35 (D. Kan. 2003).

[34] *In re Wyoming Tight Sands Antitrust Cases, 715 F. Supp. 307, 307-8* (D. Kan. 1989) (citing Fed. R. Civ. P. 53(b) ("A reference to a master shall be the exception and not the rule.")).

[35] *Harrington v. Sorelle*, 313 F.2d 10, 13 (10th Cir. 1963) (citing 5 Moore, Federal Practice 2946); *Buckley v. Altheimer*, 152 F.2d 502 (7th Cir. 1945).

they may arise in the progress of a cause, and not to displace the court."[36]  The Federal

Rules of Civil Procedure state:

> Unless a statute provides otherwise, a court may appoint a master only to:
>
> (A)  perform duties consented to by the parties;
> (B)  hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by: (i) some exceptional condition; or (ii) the need to perform an accounting or resolve a difficult computation of damages; or
> (C)  address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district.[37]

The court must also take into account the imposition of expenses on the parties.[38]

Special masters are generally a tool reserved for "situations that have some inherent

complexity, technical issues that call for someone with a specific expertise, or even to

pursue some policing or investigation outside the traditional role of judicial officers."[39]  To

prove a special master is warranted, "[t]he party requesting the appointment bears the

burden of showing the necessity of such an appointment."[40]

---

[36] *Ctr. for Legal Advocacy v. Bicha*, No. 11-CV-02285-NYW, 2018 WL 6620776, at *2 (D. Colo. Dec. 18, 2018) (citing *La Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957)).

[37] Fed. R. Civ. P. 53(a).

[38] *Ash Grove Cement Co. v. Wausau Ins. Co.*, No. 05-2339-JWLGLR, 2007 WL 689576, at *3 (D. Kan. Mar. 1, 2007).

[39] *Id.*

[40] *In re Wyoming Tight Sands Antitrust Cases,* at 307-8.

Undoubtedly, the parties have developed a pattern of discovery disputes in this case. And safe to say that doesn't look like it'll end anytime soon. Mindful that it was the undersigned (out of frustration with the parties and counsel) who first mentioned of the possibility of appointing a special master during the July 15, 2020 telephone scheduling conference, defendants' motion is understandable.

But upon review of the briefing and further consideration, the court declines to appoint a special master, at least at this time. Appointing a special master is meant for exceptional circumstances. Here, the procedural motions thus far have been briefed and resolved. The court believes the pretrial matters at this stage can continue to be effectively and timely addressed by the assigned magistrate and district judges. The undersigned has been tasked, albeit at higher-than-typical frequency, with the contemplated functions of a magistrate judge listed in 28 U.S.C. § 636(b)(1)(A).[41] The parties have requested telephone conferences when necessary, which the court has been able to accommodate, despite their ultimate relative lack of productivity. There are presently no special circumstances requiring additional functions that are intended for a special master.

The undersigned briefly discussed this issue with counsel during the August 27, 2020 telephone conference, requested and convened on an expedited basis to address yet two more disputes involving a "30(b)(6)" deposition and the accompanying documents to

---

[41] *See Trentadue v. U.S. Cent. Intelligence Agency*, No. 2:08-CV-0788, 2015 WL 1968263, at *3 (D. Utah Apr. 30, 2015) (discussing when a special master is appropriate).

be produced; the discussion morphed into disputes about how mediation would be conducted.  Defense counsel again raised their preference for a special master.  The undersigned expressed his concern that a special master wouldn't ultimately reduce the time and briefing the parties are likely to require based on their history, and he remains of that view.  Given the parties and the lawyers in this particular case, the undersigned fears that discovery rulings by a master, no matter how experienced and skilled the master might be, and no matter how well-reasoned his or her rulings might be, would be the frequent subject of objections brought before the court, leading to yet more delay and expense.

Still, some things definitely need to be done to avoid a complete train wreck, meaning the undersigned will implement tools to increase efficiency when the parties raise discovery disputes.  Of course, within reason, the undersigned will allow counsel to continue litigating this supposedly high-dollar case how they see fit (and bill their very well-financed clients accordingly (no fewer than seven lawyers populated yesterday's simple telephone conference)).  But going forward, telephonic conferences will not be allowed so readily.  During the undersigned's twenty years on the federal bench, such conferences have proven to be very useful in reducing expense and moving things along in the vast majority of cases.  Here, though, lengthy telephone conferences don't seem to have succeeded in resolving any issues definitively.  The undersigned believes that's usually because counsel haven't provided enough concrete information to put the court in a position to make a definitive ruling that would withstand scrutiny if challenged and reviewed by the presiding U.S. District Judge, Daniel D. Crabtree.  Too much time gets

spent by counsel accusing the other side of being the ones abusing discovery, followed by defending one's professional honor, and trying to get in the last word.  And then the conferences are followed by protracted briefing.  Whether the fault lies with counsel or the undersigned, or perhaps a little of both, the bottom line is that it doesn't seem to be time well spent for anyone.

So, going forward, instead of wasting more time on the telephone, the undersigned intends to redouble his efforts and make more assertive use of the court's explicit powers to proscribe discovery abuse through focused application of Rules 26(b)(1), 26(g), and 37(a)(5) of the Federal Rules of Civil Procedure.  Although the undersigned often has been reluctant to sanction lawyers, mindful they have an exceptionally difficult and stressful job under the best of circumstances, there shall be no future reluctance in this particular case. And, as relates to briefing future discovery-related motions, absent further order of the court, the meet-and-confer deadline under D. Kan. Rule 37.1(b) is hereby shortened from 30 days to 10 days.  A party's initial brief on discovery-related motions shall be limited to 5 double-spaced pages.  The deadline for filing a party's responsive brief under D. Kan. Rule 6.1(d)(1) is hereby shortened from 14 days to 2 days, and said brief shall be limited to 5 double-spaced pages; the deadline for filing any reply under the same local rule is hereby shortened from 14 days to 1 day, with said reply limited to 2 double-spaced pages. It is the undersigned's sincere (albeit faint) hope that these parameters will cause the parties to consider the most succinct and precise way to raise further issues to the court, and perhaps the necessity of doing so at all.

IT IS THEREFORE ORDERED that defendants' motion to compel (ECF No. 128) is denied except to the extent plaintiffs shall produce the five remaining e-mails on the privilege log – CTRL00003987, CTRL00004665, CTRL00005105, CTRL0005792, and CTRL00006065 – for *in camera* review by August 31, 2020.  Plaintiffs' motion for protective order (ECF No. 136) is denied.  Defendants' motion for appointment of a special master (ECF No. 132) is denied.  Plaintiffs' motion for an extension to file a reply brief in support of their procedurally defective motion for a protective order (ECF No. 151) is denied.

Dated August 28, 2020, in Kansas City, Kansas.

 s/ James P. O'Hara
James P. O'Hara
U.S. Magistrate Judge